# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT KNOXVILLE
June 25, 2024 Session

## STATE OF TENNESSEE v. BRYAN ANTHONY CAPPS

**Appeal from the Criminal Court for Knox County**
**No. 120093   Steven W. Sword, Judge**

_____

**No. E2023-01419-CCA-R3-CD**

_____

A Knox County jury convicted the Defendant, Bryan Anthony Capps, of two counts of sexual battery, two counts of sexual battery by an authority figure, and one count of violating the Sexual Offender Registry. The trial court sentenced the Defendant to an effective eight-year sentence to be served in the Tennessee Department of Correction. In his appeal, the Defendant argues that (1) the evidence was insufficient to show that the Defendant qualified as an authority figure or that he conducted an overnight visit at a residence with minors present; (2) the trial court's oath as administered to the minor witnesses, which included a "pinky promise," amounted to an improper comment on their credibility; (3) the trial court erred by allowing the prosecution to question a defense witness about felony convictions more than ten years old; and (4) the trial court erred by denying split confinement and by imposing consecutive sentences. Upon our review, we respectfully affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right;
### Judgments of the Criminal Court Affirmed

TOM GREENHOLTZ, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., J., joined. JAMES CURWOOD WITT, JR., J., not participating.[1]

Robert L. Jolley, Jr., Knoxville, Tennessee, for the appellant, Bryan Anthony Capps.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilber, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Heather Good and

---

[1]   The Honorable James Curwood Witt, Jr., passed away on August 17, 2024, and did not participate in the filing of this opinion. We acknowledge his twenty-seven years of dedicated and faithful service to this court, both as a past presiding judge and its longest-serving member.

Ashley McDermott, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL BACKGROUND**

On November 17, 2021, a Knox County grand jury returned a five-count presentment against the Defendant, charging him with two counts of sexual battery, two counts of sexual battery by an authority figure, and one count of violating the Tennessee Sexual Offender and Violent Sexual Offender Registration, Verification and Tracking Act (the "Sexual Offender Registry"). *See* Tenn. Code Ann. §§ 39-13-505; 39-13-527; 40-39-211. All four sexual battery counts involved the alleged intentional touching of the victim's breasts and genital area on or about August 9, 2020. The Sexual Offender Registry violation concerned the Defendant's alleged overnight visit to a residence where minors were present.

The trial of the case began on October 3, 2022. The court bifurcated the proceedings so that the jury first heard proof and determined guilt on the sexual battery offenses before hearing evidence on the Sexual Offender Registry violation.

A. **SEXUAL BATTERY OFFENSES**

1. **State's Proof**

The State's proof established that, in August 2020, the victim was fourteen years old and lived with her legal guardians, Ashley Capps and her husband. The victim also lived with her guardians' minor daughter, A.D. The Defendant was in his mid-thirties and was married to Nikki Capps. They had two minor children, including the Defendant's son, D.S.[2]

The victim testified that she had known the Defendant her entire life and had a close relationship with him, often spending time together. She trusted and loved him.

---

[2] It is the custom of this court to use initials in place of the minors' full names. The initials A.D. are not those of Ashley Capps's minor daughter, and the initials D.S. are not those of the Defendant's minor son. We use both sets of initials only to identify these witnesses, respectively, as part of the victim's family and the Defendant's family.

In the summer of 2020, the victim occasionally visited the home of the Defendant's family for cookouts and to play with his children, often accompanied by A.D.[3] On August 8, 2020, A.D. and the victim spent the night there after spending the day playing with D.S.

The victim eventually fell asleep on a large L-shaped couch, along with the Defendant and the other children. According to the victim, she and the Defendant were lying with their heads near each other and their feet pointing in opposite directions. D.S. was lying next to the victim, and A.D. was on another section of the couch. Each person had their own blanket.

The victim awoke that evening to someone touching her stomach over her clothing area but underneath the blanket. Though the victim could not tell what time it was because she did not have her phone nearby, she saw it was dark outside and thought it was early morning. When the victim "slightly" opened her eyes, she saw that it was the Defendant touching her. According to the victim, the Defendant eventually touched her genital area and "grabb[ed]" her breasts. The victim indicated that all the touches happened over her clothing. She explained that she felt two fingers trying to go inside the inner liner of her shorts, though the Defendant was never able to breach the liner.

The victim testified that she was "in shock" and scared and that she did not know what to do, but she knew the Defendant should not be touching her in such a way. She said she tried to move away from the Defendant without alerting him that she was awake. The victim indicated that the touching stopped when the Defendant's wife woke up and walked through the house to use the bathroom. According to the victim, the Defendant "yank[ed]" his hand away when he noticed his wife's presence. The victim estimated that the episode lasted about eight minutes.

Following the incident, the victim stayed on the couch because she was "shocked and confused" and eventually fell back asleep. In the morning, the victim and A.D. ate breakfast with the Defendant and his family before Ms. Capps came and picked them up. Ms. Capps could tell that something was wrong with the victim, but the victim did not say anything because the Defendant followed them to the car. About "an hour or two" after leaving, the victim told Ms. Capps what had happened. At the softball field for A.D.'s practice, the victim explained to Ms. Capps what the Defendant had done.

---

[3] After separating from his wife, the Defendant moved to his mother's house in March 2020. His wife and children remained at the family residence, and the Defendant often returned there to visit his children.

The victim indicated that no one called the police that day at the request of the Defendant's mother. However, the police were eventually informed of the allegations in February 2021, about six months after it had happened. A.D. explained that she decided to tell the police at that time because she saw a photograph of her younger sister at the Defendant's family's home, which was concerning. She told an investigator with the Department of Children's Services that the events happened around three or four in the morning, though she was uncertain of the time.

### 2. Defense Proof

The Defendant called three witnesses, including the victim's aunt, the Defendant's mother, and Brandon Scarborough, to testify that the victim had a reputation for not being "very truthful" in the community. The Defendant's wife testified that she cooked dinner, watched a movie in her bedroom, and fell asleep on the night of August 8, 2020. When she woke the next morning, she saw the victim, A.D., and D.S. asleep on the couch, but did not see the Defendant. Although she did not see the Defendant leave or return to the residence on this occasion, the Defendant's wife testified that it was unusual for him to spend the night at their home in August 2020 because he was living with his mother.

The Defendant testified on his own behalf and denied touching the victim. He said that on the evening of August 8, 2020, he was with his friend and arrived at his wife's house "awfully late[.]" He started doing laundry and "hung out for a little bit" before leaving to return to his mother's house to spend the night. The Defendant said that he left his wife's house before midnight but did not tell her that he was leaving. He could not recall when he returned to her house the following morning.

In his testimony, the Defendant denied touching the victim, saying he left the residence before midnight and returned the following morning. He visited the residence daily to spend time with his two children.

Following the conclusion of the proof, the jury found the Defendant guilty as charged with two counts of sexual battery and two counts of sexual battery by an authority figure. The parties proceeded to the bifurcated portion of the trial to determine the Defendant's guilt for the Sexual Offender Registry violation.

4

## B.  TRIAL ON SEXUAL OFFENDER REGISTRY VIOLATION

The State alleged that the Defendant violated the Sexual Offender Registry by staying overnight at a residence where minors were present. As part of its proof, the State entered a certified judgment of the Defendant's January 17, 2008, conviction for sexual battery of a twelve-year-old girl. The State then called Timothy Thornton, an officer with the Knoxville Police Department's Violent Crimes Unit, as a witness.

Officer Thornton confirmed that the Defendant was registered as a sexual offender on August 8 and 9, 2020. He also testified that the Defendant moved to his mother's house in March 2020 but frequently returned to his wife's home to visit his children and help them with their daily activities. The officer confirmed that it was permissible, under the terms of his registration requirements, for the Defendant to spend time at his wife's home with his biological children.

Following the conclusion of the proof, the jury found the Defendant guilty of violating the Sexual Offender Registry.

## C.  POST-TRIAL PROCEEDINGS

The trial court held a sentencing hearing on January 12 and March 23, 2023. The parties introduced the following documents as exhibits: the presentence investigation report that included a risk and needs assessment; a certified copy of the Defendant's 2008 judgment of conviction for sexual battery; a certified copy of the judgment of his prior 2015 attempted violation of the Sexual Offender Registry; victim impact statements from the victim and Ms. Capps; the psychosexual risk assessment report from Dr. J. Michael Adler; and certificates the Defendant received for classes he had attended while in custody.

The victim impact statements were read into the record. In her statement, the victim confirmed that she received counseling as a result of the abuse and required medication for depression and anxiety. She also said that she had lost "close family members" because she had reported the abuse and that she had been called "a liar and a troublemaker." She wrote that "[t]his whole process ha[d] been very painful and hurtful" and that it had caused her to experience a range of emotions such as terror, anger, sadness, and grief. The victim said that she felt "disgusted and dirty because of what [had] happened" to her and that she felt "betray[ed]" by someone she had loved and trusted her entire life.

Dr. Adler's psychosexual risk assessment report showed that, although three girls reported that the Defendant had touched them when they were young, the Defendant took

no responsibility whatsoever. The Defendant told Dr. Adler that he was never alone with the victim and that he was not there the evening when she claimed the incident occurred. According to Dr. Adler, the Defendant's lack of recognition of his problem and his belief that he does not need treatment were significant factors associated with a poor treatment outcome. Dr. Adler also noted that the Defendant was at moderate risk of reoffending without sexual offender treatment, that he was a poor candidate for sexual offender treatment, and that his refusal to admit that he committed a sexual offense significantly impacted his amenability to treatment.

At the outset of its sentencing ruling, the trial court stated it had considered the evidence, including the presentence report, principles for sentencing, enhancement and mitigating factors, and Dr. Adler's report. The trial court merged Counts 1, 2, 4, and 5 into a single conviction for sexual battery by an authority figure (Count 4), finding one instance of continuous conduct. It sentenced the Defendant to six years, plus two years for violating the Sexual Offender Registry, to be served consecutively. The trial court denied any form of alternative sentencing and ordered the Defendant to serve his effective eight-year sentence in the Tennessee Department of Correction.

The Defendant filed a timely motion for a new trial, which the trial court denied on September 8, 2023. The Defendant filed a timely notice of appeal on October 5, 2023.

## ANALYSIS

In this appeal, the Defendant raises several issues for our review. He first argues that the evidence was legally insufficient to support his convictions. The Defendant also asserts that the trial court improperly commented on the credibility of the minor witnesses during the administration of the oath. Next, he contends that the trial court improperly allowed the State to impeach a witness with prior felony convictions older than ten years. And finally, the Defendant argues that the trial court erred in sentencing him. We address each of these issues in turn.

### A.     LEGAL SUFFICIENCY OF THE EVIDENCE

The Defendant first asserts that the proof was legally insufficient to support his convictions for sexual battery by an authority figure and violating the Sexual Offender Registry. He argues that the evidence failed to show that he was an authority figure pursuant to Tennessee Code Annotated section 39-13-527(a). He also contends that the evidence was insufficient to prove he conducted an overnight visit with minors, thus invalidating his conviction for violating the Sexual Offender Registry. The State responds

that it presented sufficient proof at trial showing the Defendant was an authority figure and that he stayed overnight in violation of the Sexual Offender Registry requirements. We agree with the State.

### 1. Standard of Appellate Review

"The standard for appellate review of a claim challenging the sufficiency of the State's evidence is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Miller*, 638 S.W.3d 136, 157 (Tenn. 2021) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard of review is "highly deferential" in favor of the jury's verdict. *See State v. Lyons*, 669 S.W.3d 775, 791 (Tenn. 2023). Indeed, "[w]hen making that determination, the prosecution is afforded the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *State v. Thomas*, 687 S.W.3d 223, 249 (Tenn. 2024) (citation and internal quotation marks omitted). To that end, "[w]e do not reweigh the evidence, because questions regarding witness credibility, the weight to be given the evidence, and factual issues raised by the evidence are resolved by the jury, as the trier of fact." *State v. Shackleford*, 673 S.W.3d 243, 250 (Tenn. 2023) (citations omitted). "The standard of review is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citation and internal quotation marks omitted).

### 2. Sexual Battery by an Authority Figure

The jury found the Defendant guilty of two counts of sexual battery by an authority figure. Relative to these convictions, Count 4 of the presentment stated that the Defendant "[o]n or about the 9th day of August, 2020, . . . did unlawfully and knowingly have sexual contact with [victim], to wit: intentional touching of [the victim's] primary genital area, who was at the time of the offense thirteen (13) years of age or older but less than eighteen (18) years of age, and [the Defendant] was at the time of the offense in a position of trust and used such position of trust to accomplish the sexual contact, in violation of T.C.A. § 39-13-527[.]" Count 5 of the presentment was the same as Count 4, except the act described therein was the "intentional touching of [the victim's] breast[.]"

Our General Assembly has defined the crime of sexual battery by an authority figure as being "unlawful sexual contact with a victim by the defendant" when the victim at the time of the offense was "thirteen (13) years of age or older but less th[a]n eighteen (18) years of age[.]" Tenn. Code Ann. § 39-13-527(a). Pursuant to the statute, for a defendant

7

to be considered an authority figure, the defendant, at the time of the offense, must have been "in a position of trust, or had supervisory or disciplinary power over the victim by virtue of the defendant's legal, professional or occupational status and used the position of trust or power to accomplish the sexual contact." *Id.* § 39-13-527(a)(3)(A). "Sexual contact" is defined as "the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" *Id.* § 39-13-501(6). "Intimate parts" includes "the primary genital area . . . or breast of a human being[.]" *Id.* § 39-13-501(2).

Specifically, the Defendant argues that the State did not show that he was an "authority figure" because he had no disciplinary authority over the victim. He also asserts that his occupational status was otherwise irrelevant to his relationship with the victim. The State responds that an "authority figure" also includes a person who is in a "position of trust" with respect to the victim. It asserts that the evidence shows that the Defendant occupied a position of trust with respect to the victim and that he used this trust to accomplish the sexual acts. We agree with the State.

a.      **Definition of "Authority Figure"**

Though framed as a challenge to the legal sufficiency of the evidence, the Defendant's issue in this regard raises a question of statutory interpretation. Because this issue requires a legal interpretation of a statute, the issue is one of law that this court reviews de novo with no presumption of correctness. *State v. Jones*, 589 S.W.3d 747, 756 (Tenn. 2019).

The Defendant challenges only the element that he was in a position of trust with respect to the victim.[4] He asserts that, pursuant to the statute, he could occupy a "position of trust" only if he did so through his "legal, professional or occupational status." Thus, according to the Defendant, he was an authority figure only if (1) he was in a position of trust with the victim *because of* his legal, professional, or occupational status; or (2) he had

---

[4]      The Defendant does challenge his status as a parental or custodial figure used to classify him as an authority figure pursuant to section 39-13-527(a)(3)(B). However, the presentment only charged that the Defendant occupied a position of trust with the victim, and the jury was likewise singularly charged. As such, because this subsection did not form the basis of the jury's verdict, it is not relevant to the issues presented in this appeal.

supervisory or disciplinary power over the victim *because of* his legal, professional, or occupational status.

The State disagrees. It argues that "a position of trust" is not defined by a legal, professional, or occupational status but is instead an independent ground of liability. Thus, according to the State, the Defendant was an authority figure if (1) he was in a position of trust with respect to the victim; or (2) he otherwise had supervisory or disciplinary power over the victim by virtue of his legal, professional, or occupational status.

As our supreme court has recognized, "[w]e generally interpret statutory terms according to their "natural and ordinary meaning." *Williams v. Smyrna Residential, LLC*, 685 S.W.3d 718, 723 (Tenn. 2024) (citing *State v. Deberry*, 651 S.W.3d 918, 925 (Tenn. 2022)). In so doing, we ask "how a reasonable reader, fully competent in the language, would have understood the text at the time it was issued." *Id.* (citation omitted); *Lawson v. Hawkins County*, 661 S.W.3d 54, 59 (Tenn. 2023) ("In interpreting statutory provisions, our role is to determine how a reasonable reader would have understood the text at the time it was enacted."). As part of that endeavor, we may initially consider the statutory text, the broader statutory framework, and any relevant canons of statutory construction. *Deberry*, 651 S.W.3d at 925.

Thus, "[w]hen statutory language is plain and unambiguous, this [c]ourt must not apply a construction apart from the words of the statute." *State v. Nelson*, 23 S.W.3d 270, 271 (Tenn. 2000). In other words, "we apply the plain language in its normal and accepted use" without recourse to "legislative history, historical background, or other external sources of the Legislature's purpose." *State v. Strode*, 232 S.W.3d 1, 10-11 (Tenn. 2007) (citations and internal quotation marks omitted). Instead, our obligation "is simply to enforce the written language." *In re Estate of Davis*, 308 S.W.3d 832, 837 (Tenn. 2010); *see State v. Jackson*, No. W2019-01883-CCA-R3-CD, 2021 WL 1157025, at *3 (Tenn. Crim. App. Mar. 25, 2021) (quoting *Davis*, 308 S.W.3d at 837), *perm. app. denied* (Tenn. July 15, 2021).

As we must, we start with the language of the statute. It provides that a defendant is an authority figure if he or she was "in a position of trust, or had supervisory or disciplinary power over the victim by virtue of the defendant's legal, professional or occupational status and used the position of trust or power to accomplish the sexual contact[.]" Tenn. Code Ann. § 39-13-527(a)(3)(A).

The legislature's use of the word "or" to separate two clauses describing distinct types of authority figures is significant. The word "or" is disjunctive; it usually indicates

an alternative between two or more options. *See Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 87 (2018) (explaining that the word "or" is "almost always disjunctive"); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 116 (2012) ("Under the conjunctive/disjunctive canon, *and* combines items while *or* creates alternatives."). As used in its normal and ordinary sense, the word "or" typically signals an alternative, indicating that the reader should treat the various parts of the sentence it connects separately. *E.g.*, *State v. Cleveland*, No. W2004-02892-CCA-R3-CD, 2005 WL 1707975, at *3 (Tenn. Crim. App. July 21, 2005) ("It is a well[-]established rule of construction that when the disjunctive conjunction 'or' is used in a statute, the various elements are to be treated separately, with any one element sufficient to meet the objectives outlined in the statute."), *no perm. app. filed*.

Contrary to the Defendant's argument, an ordinary reader would not understand the statute to define a position of trust as one where a defendant has supervisory or disciplinary power over the victim. Otherwise, the statute would have used the word "with" instead of "or had," such that an authority figure would be someone who is "in a position of trust *with* supervisory or disciplinary power over the victim." We presume "that the legislature purposefully chose each word used in a statute and that each word conveys a specific purpose and meaning." *State v. Hannah*, 259 S.W.3d 716, 721 (Tenn. 2008) (citations omitted). The use of the words "or had supervisory or disciplinary power" plainly describes a circumstance that is different and separate from being in a position of trust.

Indeed, the statute later uses this very distinction in describing how a defendant uses these conditions. According to the statute, it is not enough for a defendant to be in a position of trust or have supervisory or disciplinary power over the victim. The defendant must also "use[] the position of trust *or* power to accomplish the sexual contact." Tenn. Code Ann. § 39-13-527(a)(3)(A). Because the statute describes the different statuses alternatively—the defendant used "the position of trust *or* power"—a reasonable reader would understand that the two statuses, trust and power, are different concepts. In other words, a "position of trust" is not defined as having supervisory or disciplinary power over the victim; it is a separate status from one having that power.

This interpretation is consistent with at least one other opinion from this court interpreting the sexual battery statute. *See State v. Simmons*, No. M2014-02086-CCA-R3-CD, 2015 WL 7354311, at *11 (Tenn. Crim. App. Nov. 20, 2015) (stating that the evidence must establish that a defendant "was either in a position of trust or that he had supervisory or disciplinary power" but that "the State is not required to prove both"), *no perm. app. filed*. It is also consistent with how we have defined the term "position of trust" within the confines of sexual offenses committed by an authority figure.

For example, the offense of statutory rape by an authority figure uses identical language to define the status of an authority figure: "The defendant was, at the time of the offense, in a position of trust, or had supervisory or disciplinary power over the victim by virtue of the defendant's legal, professional or occupational status and used the position of trust or power to accomplish the sexual penetration." Tenn. Code Ann. § 39-13-532(a)(3). In interpreting this statute, we recognized that

> [a]ccording to the statute, the State is required to prove that at the time of the offense, the defendant was in a position of trust or had supervisory or disciplinary power over the victim by virtue of the defendant's legal, professional, or occupational status; the State is not required to prove both.

*State v. McGrowder*, No. M2013-01184-CCA-R3-CD, 2014 WL 4723100, at *9 (Tenn. Crim. App. Sept. 23, 2014), *perm. app. denied* (Tenn. Feb. 2, 2015); *see also State v. Tice*, No. M2021-00495-CCA-R3-CD, 2022 WL 2800876, at *21-22 (Tenn. Crim. App. July 18, 2022) (statutory rape by an authority figure), *perm. app. denied* (Tenn. Dec. 14, 2022). Accordingly, we conclude that the Defendant may be considered an authority figure if the evidence shows he was "in a position of trust" with the victim.

In pressing his argument to the contrary, the Defendant cites *State v. Berkley* to argue that positions of trust and power are the same under section 39-13-527(a)(3)(A). *See State v. Berkley*, No. W2015-00831-CCA-R3-CD, 2016 WL 3006941 (Tenn. Crim. App. May 17, 2016), *perm. app. denied* (Tenn. Sept. 23, 2016). We respectfully disagree. In *Berkley*, the court defined the crime as being accomplished by a defendant "in a position of trust with the victim" who used that "position of trust to accomplish the sexual contact." *Id.* at *1-4. The opinion did not discuss the use of power based upon "legal, professional or occupational status," nor did it rely on that status to affirm the convictions. This argument is without merit.

### b. Proof at Trial

Our statutes do not define "position of trust" as it is used in sexual offenses involving an authority figure. However, our case law has defined the concept by reference to definitions of "trust" and by analogy to sentencing enhancements based upon an abuse of a position of trust. *E.g.*, *Tice*, 2022 WL 2800876, at *22; *Simmons*, 2015 WL 7354311, at *12; *McGrowder*, 2014 WL 4723100, at *10.

In examining whether a defendant had abused a position of public or private trust for purposes of sentencing, our supreme court has explained that a "court must look to 'the

11

nature of the relationship,' and whether that relationship 'promoted confidence, reliability, or faith.' A relationship which promotes confidence, reliability, or faith, usually includes a degree of vulnerability." *State v. Gutierrez*, 5 S.W.3d 641, 646 (Tenn. 1999) (quoting *State v. Kissinger*, 922 S.W.2d 482, 488 (Tenn. 1996)). Notably, "[t]he position of parent, step-parent, babysitter, teacher, coach are but a few obvious examples. The determination of the existence of a position of trust does not depend on the length or formality of the relationship, but upon the nature of the relationship." *Kissinger*, 922 S.W.2d at 488. We have also affirmed a finding that the defendant abused a private trust when he had been entrusted with the victims' care on account of his close relationship with their family. *See State v. Ciaramitaro*, No. W2021-00046-CCA-R3-CD, 2022 WL 1460242, at *11 (Tenn. Crim. App. May 9, 2022), *no perm. app. filed*.

In this case, the victim testified that she was related to the Defendant, that she had been close with him throughout her life, and that they often spent time together. She testified that she trusted and loved him. At the time of these offenses, the victim was fourteen years old, and the Defendant was around thirty-four or thirty-five. The victim's legal guardians were the Defendant's brother and sister-in-law. Ms. Capps described a close-knit family where her husband, the Defendant, and their collective children would go to the circus, birthday parties, and sporting events together. The Defendant was an adult with children slightly younger than the victim, and the victim and A.D. had been babysitting the Defendant's children previously on the day in question. Ms. Capps allowed the victim and her daughter to stay the night with the Defendant and his family that evening after babysitting.

The victim's care was entrusted to the Defendant and his family for the evening of August 8; thus, the Defendant was in a safeguarding relationship with the victim, and the victim was left unsupervised on the couch that evening with the Defendant because of this familial bond. The victim testified that, when the Defendant touched her on her breasts and on top of her underwear, she was "in shock" and scared because she knew the Defendant should not be touching her in such a way. It was only because the Defendant stood in a position of trust with respect to the victim that he was able to commit these crimes.

Taken in the light most favorable to the State, the facts and circumstances in this case established that at the time of the offenses, the Defendant stood in a position of trust with the victim, and he used the position of trust to accomplish the sexual contact. Accordingly, a rational trier of fact could have found the necessary elements to convict the Defendant of sexual battery by an authority figure beyond a reasonable doubt. We respectfully affirm the judgments of the trial court.

12

### 3. Sexual Offender Registry Violation

The Defendant also argues that the proof is legally insufficient to support his conviction for violation of the Sexual Offender Registry. More specifically, he argues that the evidence fails to show he conducted an overnight visit to a residence with minors present. He claims the State only showed he was at his wife's home for a few hours on the evening of August 8 and again on the morning of August 9. The State responds that a rational trier of fact could have found the Defendant guilty beyond a reasonable doubt by accrediting testimony from the victim and A.D. that they fell asleep on the couch with the Defendant that evening and that they also saw him on the couch later that night when they awoke while it was dark outside. We agree with the State.

Tennessee Code Annotated section 40-39-211(c)(1) states, in relevant part, "While mandated to comply with the requirements of this part, no sexual offender or violent sexual offender, whose victim was a minor, shall knowingly reside or conduct an overnight visit at a residence in which a minor resides or is present." A sexual offender includes a person who has been convicted of sexual battery. Tenn. Code Ann. § 40-39-202(19), (20).

At trial, the State introduced a certified judgment of conviction reflecting that the Defendant had previously pled guilty on January 17, 2008, to sexual battery, and Officer Thornton testified that the victim in the previous case was twelve years old at the time of the offense. Officer Thornton confirmed that the Defendant was a registered sexual offender on August 8 and 9, 2020, and that the Defendant was, therefore, required to abide by the conditions of the registry.

In addition, the victim testified that on the evening of August 8, she, the Defendant, A.D., and D.S. all fell asleep on the couch. The victim woke up when she felt the Defendant touching her stomach under the blanket. Though the victim was unsure exactly what time it was, it was dark outside, and she thought it was early morning. A.D. said that whenever she stayed overnight at the South Knoxville home, the Defendant would also stay overnight. She also testified that she, the victim, the Defendant, and D.S. fell asleep on the couch. At some point during the night, A.D. awoke and noticed that the Defendant was still asleep on the couch at that time. Though A.D. could not recall an exact time, she also believed it was dark outside. She said that the Defendant was in the house when she awoke the following morning.

The Defendant's arguments collectively amount to an invitation to reweigh the evidence and to disturb the jury's determinations on appeal. We respectfully decline to do so. *See Shackleford*, 673 S.W.3d at 250 ("We do not reweigh the evidence, because

13

questions regarding witness credibility, the weight to be given the evidence, and factual issues raised by the evidence are resolved by the jury, as the trier of fact."). Moreover, a rational juror could infer that the Defendant stayed overnight in the residence even though he was not observed continuously in the home over this extended time. Consistent with the settled standard of review, we credit the testimony of the State's witnesses, including the victim and A.D., and draw all reasonable inferences in the State's favor. We conclude that the evidence is legally sufficient to sustain the Defendant's conviction for violating the Sexual Offender Registry requirements.

## B.    QUALIFICATION OF MINOR WITNESSES

The Defendant next argues that the trial court improperly commented on the credibility of the State's minor witnesses—the victim and A.D.—by performing a "pinky promise" with them. He contends that the trial judge improperly discussed with the witnesses his personal life experience with his own daughters and then improperly asked the witnesses to give a pinky promise to tell the truth. He asserts that this practice gave the jury the impression that the witnesses "would absolutely be telling the truth in their testimony."

The State argues that the trial court did not abuse its discretion in administering the oath by asking these witnesses to make a pinky promise, which was done to awaken their consciences and impress upon them the solemnity of the oath and their duty to testify truthfully as required by Rule 603 of the Tennessee Rules of Evidence. We agree with the State that the trial court did not abuse its discretion in qualifying the minor witnesses.

### 1.    Background

The State called the victim, who was then sixteen years old, to testify. After she was sworn to tell the truth, the trial court asked her additional questions about her understanding of the oath. Holding a paper sticky note, the court asked if it was true that the note was red. The victim said it was a lie and explained that the note was another color. The court emphasized the importance of answering truthfully based on actual events. The victim said she understood.

After that, the court initiated a discussion with the witness by explaining the concept of a "pinky promise," describing it as a symbolic and serious commitment practiced by the judge's daughters, where they interlocked pinkies to signify an unbreakable promise. The court asked the witness whether she had a similar practice with her friends. The witness

confirmed that she used pinky promises and elaborated that her version included interlocking pinkies followed by a kiss on her hand to seal the promise.

The court then asked the witness to demonstrate this ritual and confirm her willingness to make a pinky promise to tell the truth during her testimony. The witness performed the gesture and affirmed her promise. Satisfied with this demonstration, the court concluded that the witness understood the significance of the oath to tell the truth and allowed the prosecution to proceed with direct examination.

Before the State began, defense counsel objected to "the pink[y] swear portion" of what just happened. The trial court overruled the objection, and questioning of the victim began.

In rebuttal, the State called fourteen-year-old A.D. to testify. The trial court engaged in a similar procedure with A.D. as it did with the victim. A.D. was sworn to tell the truth, and the trial court asked additional questions. The court referred to the color of a paper sticky note and assessed A.D.'s ability to distinguish truth from a lie. The court emphasized the importance of promising to tell the truth, engaging the witness in a discussion about pinky promises, similar to those the court's daughters practiced. The witness confirmed familiarity with the practice and performed a pinky promise to tell the truth. Satisfied with her understanding and commitment, the court allowed questioning to proceed. To preserve the record, defense counsel renewed his objection to the court's use of the pinky promise.

### 2. Administration of the Witness Oath

On appeal, the Defendant argues that the trial court's statements and actions regarding the pinky promise made while administering the oaths amounted to improper comments on the evidence. Under the Tennessee Rules of Evidence, every person, including a child witness, is "presumed competent to be a witness except as otherwise provided in these rules or by statute." Tenn. R. Evid. 601; *State v. Kendricks*, 947 S.W.2d 875, 881 (Tenn. Crim. App. 1996) ("There is no general exception [to witness competency] based on age."). However, "[b]efore testifying, every witness shall be required to declare that the witness will testify truthfully by oath or affirmation, administered in a form calculated to awaken the witness's conscience and impress the witness's mind with the duty to do so." Tenn. R. Evid. 603.

Importantly, "the crux of Rule 603 is that the witness must be aware of and sensitive to the obligation to tell the truth under oath." *State v. Jackson*, 52 S.W.3d 661, 667 (Tenn. Crim. App. 2001). Thus, "[w]hen examining a child's competency to testify[,] a judge

15

should determine whether the child understands the nature and meaning of an oath, has the intelligence to understand the subject matter of the testimony, and is capable of relating the facts accurately." *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993). We review a trial court's finding that a minor is competent to testify for an abuse of discretion. *See Kendricks*, 947 S.W.2d at 881.

At the time of trial, the victim and A.D. were fourteen and sixteen years of age, respectively. Both were "first duly sworn to tell the truth, the whole truth, and nothing but the truth[.]" Recognizing their status as minors, the trial court asked additional questions to confirm their understanding of the oath and the obligation to tell the truth. Both witnesses testified that they understood the difference between truth and falsehood, which the court illustrated by misidentifying the color of a paper sticky note. The trial court referenced childhood practices, such as pinky promises, as assurances of truthfulness, and both children confirmed their familiarity with this practice. The court had each witness perform a pinky promise to affirm their intention to testify truthfully and then allowed questioning to proceed.

The Defendant contends that the trial court exceeded its role in ensuring that the minor witnesses understood their oath and instead improperly commented on their credibility. Relying on *State v. Suttles*, 767 S.W.2d 403 (Tenn. 1989), the Defendant argues that the court suggested that the victim and A.D. were testifying in good faith. He asserts that because the principal defense involved the credibility of these two witnesses, the court "tipped the scales" in favor of the State.

Improper comments from the court can, and sometimes do, result in the reversal of a judgment. *See generally Suttles*, 767 S.W.2d at 407; *Cleckner v. Dale*, 719 S.W.2d 535 (Tenn. Ct. App. 1986), *abrogated on other grounds by Chapman v. Bearfield*, 207 S.W.3d 736 (Tenn. 2006). In particular, "judges in Tennessee are prohibited by the state constitution from commenting upon the credibility of witnesses or upon the evidence in the case." *Suttles*, 767 S.W.2d at 406. "Though a judge is permitted to question a witness, even very slight indications of opinion on the part of the judge can have a powerful impact upon the minds of the jury." *Kanbi v. Sousa*, 26 S.W.3d 495, 498 (Tenn. Ct. App. 2000). To protect the jury's fact-finding role, the trial court must be "very careful not to give the jury any impression as to his feelings" or "make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury." *Suttles*, 767 S.W.2d at 407.

In *Suttles*, the supreme court addressed a sexual offense in which the trial court's comments were interpreted as an endorsement of the child victim's credibility. There, the

16

trial court privately interviewed the victim, emphasized this interaction to the jury, and then described the victim as "truthful" and "believable[.]" *Suttles*, 767 S.W.2d at 406. The supreme court held that these actions violated article VI, section 9 of the Tennessee Constitution, which prohibits judges "from commenting upon the credibility of witnesses or upon the evidence in the case." *Id.* at 406-07.

The trial court's actions here differed significantly from *Suttles*. The court ensured that the witnesses understood their duty to testify truthfully and highlighted the difference between truth and falsity. *See Ballard*, 855 S.W.2d at 560; *State v. Fears*, 659 S.W.2d 370, 375 (Tenn. Crim. App. 1983). Its discussion with the witnesses did not address central factual issues, and the court did not state or imply a personal opinion on their credibility before the jury. *See Kanbi*, 26 S.W.3d at 499.

Importantly, courts must employ child-appropriate language, including using familiar concepts like promises, to impress upon child witnesses their duty to be truthful. *See Kendricks*, 947 S.W.2d at 881; *State v. Ledbetter*, No. M2002-02125-CCA-R3-CD, 2003 WL 21877667, at *8 (Tenn. Crim. App. Aug. 7, 2003), *perm. app. denied* (Tenn. Dec. 29, 2003). As in other cases, "we fail to see how asking someone whether they are going to lie, which could be answered yes or no, is an expression of a belief that they are being truthful." *State v. Toles*, No. W2018-01175-CCA-R3-CD, 2019 WL 2167835, at *15 (Tenn. Crim. App. May 17, 2019), *perm. app. denied* (Tenn. Sept. 20, 2019); *Ledbetter*, 2003 WL 21877667, at *7-8 (finding "without merit" the defendant's argument that the trial court improperly vouched for the truthfulness of child witness by asking if she "promised . . . [to] tell the truth to the jury"). Instead, the trial judge's inquiry was an attempt to awaken the consciences of the witnesses and impress upon their minds the duty to tell the truth.

In its final instructions, the trial court clarified that its rulings on the admissibility of evidence, along with its instructions and remarks, were not intended to express any opinion on the facts or the jury's verdict. The court also emphasized the jury's role as the trier of fact. It instructed jurors that they were free to decide which witnesses to believe and how much weight to give their testimony, while using their common sense and life experience. Courts presume that juries follow such instructions, and our supreme court has recognized that these particular instructions may mitigate any prejudicial effect in similar situations. *See Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 134 (Tenn. 2004).

Considering the entire record, the trial court reasonably complied with Rule 603 in administering the oath to the minor witnesses. The trial court acted within its discretion in administering the oath, and the Defendant is not entitled to relief on this issue.

## C.    IMPEACHMENT WITH PRIOR CONVICTIONS

The Defendant next argues that the trial court improperly allowed the State to impeach Mr. Scarborough with convictions older than ten years, thereby violating Tennessee Rule of Evidence 609(b). More specifically, the Defendant asserts that the State failed to provide notice of the impeaching convictions and that the court did not conduct the required balancing test for admissibility. He urges this court to review the admissibility of the evidence de novo and conclude that Mr. Scarborough's stale convictions were inadmissible.

The State agrees that our review is de novo because the trial court did not conduct the required weighing analysis. However, it contends that because there is no evidence indicating whether Mr. Scarborough served his sentence in confinement, the record does not demonstrate that the convictions were stale for impeachment purposes. Additionally, the State argues that even if the convictions were stale, they were nevertheless admissible due to their nature as crimes of dishonesty and their probative value significantly outweighed the risk of unfair prejudice. We agree with the State.

### 1.    Background

Before cross-examining Mr. Scarborough, the State requested a bench conference. The State indicated that there was an individual with the same name in their information system with prior felony convictions, which included a burglary conviction. The trial court stated that the State could ask the witness whether he was the same individual, had his date of birth, and, if so, whether he was "convicted of this offense on this day, under 609." Defense counsel inquired if such should occur outside of the jury's presence, and the trial court replied in the negative, reasoning that whether such was necessary depended on what the witness said. According to the trial court, if the witness denied it was him, a jury-out hearing might be needed to see if extrinsic evidence of the convictions was admissible.

During cross-examination, Mr. Scarborough admitted he had been convicted of aggravated burglary on December 3, 2010. Defense counsel objected and requested another bench conference. Defense counsel noted that there was a "ten-year limit on cross-examination[,]" to which the trial court responded, "No, not on . . . crimes of dishonesty, which aggravated burglary clearly is. And so that would qualify under the exception to the ten-year rule."

18

When questioning in front of the jury resumed, Mr. Scarborough acknowledged that he was also convicted of felony theft on December 3, 2010. He further stated that these two convictions arose from the same incident and were two counts of the same indictment.

### 2. Standard of Appellate Review

Ordinarily, "[w]e review a trial court's ruling on the admissibility of prior convictions for impeachment purposes under an abuse of discretion standard." *State v. Waller*, 118 S.W.3d 368, 371 (Tenn. 2003). "A trial court abuses its discretion when it applies an incorrect legal standard or reaches a decision that is against logic or reasoning that causes an injustice to the party complaining." *State v. Russell*, 382 S.W.3d 312, 317 (Tenn. 2012).

However, a trial court's decision is not entitled to deference when it fails to substantially comply with Rule 609's procedural requirements. *State v. Lankford*, 298 S.W.3d 176, 181-82 (Tenn. Crim. App. 2008). In this case, the appellate record does not show that the trial court balanced the probative value of the convictions against their unfairly prejudicial effect, if any. *See* Tenn. R. Evid. 609(a)(3), (b). As such, we agree with both parties that our review is de novo. Therefore, we must "independently determine the admissibility of the prior impeaching conviction based on the evidence presented." *Lankford*, 298 S.W.3d at 182.

### 3. Tennessee Rule of Evidence 609

Tennessee Rule of Evidence 609(a)(2) provides that a witness's credibility may be impeached by evidence of a conviction of crimes "punishable by death or imprisonment in excess of one year under the law under which the witness was convicted or, if not so punishable, the crime must have involved dishonesty or false statement." To explain the distinction between the two categories, this court has previously stated that "[t]o be *eligible* as an impeaching conviction, a prior *felony* conviction need not involve dishonesty." *State v. Osborne*, 251 S.W.3d 1, 22 (Tenn. Crim. App. 2007) (citation and internal quotation marks omitted, emphasis in original). In the instant case, the parties do not dispute that the witness's prior convictions for theft and aggravated burglary were felonies for purposes of Rule 609(a)(2).

However, the admission of prior felonies for impeachment purposes is governed by different standards depending on when the felonies were committed in relation to the current charges. If the impeaching conviction relates to a witness other than the accused, then the conviction is typically admissible unless otherwise excluded by Tennessee Rule

of Evidence 403. *See* Tenn. R. Evid. 609, adv. comm'n cmt. (stating that for witnesses other than the criminally accused, "the balancing test is different. Rule 403 applies, and a conviction would be admissible to impeach unless 'its probative value is substantially outweighed by the danger of unfair prejudice' or other criteria listed in that rule.").

However, a heightened standard applies when the impeaching conviction is stale, meaning that more than ten years have elapsed since the witness was released from confinement or, if the witness was not confined, the date of conviction. In that circumstance, the prior conviction is admissible if the proponent gives the adverse party sufficient notice and the trial court "determines in the interests of justice that the probative value of the conviction, supported by specific facts and circumstances, *substantially outweighs* its prejudicial effect." Tenn. R. Evid. 609(b) (emphasis added). As a practical matter, "the balancing test required by [Tennessee Rule of Evidence] 609(b) ordinarily results in the exclusion of the evidence of the stale conviction." *Ingram v. Earthman*, 993 S.W.2d 611, 639 (Tenn. Ct. App. 1998); *see State v. Smith*, No. 910, 1990 WL 157419, at *4 (Tenn. Crim. App. Oct. 19, 1990) ("Rule 609(b) creates, in effect, a rebuttable presumption that convictions over ten years old are more prejudicial than helpful and should be excluded.").

Upon our de novo review, we cannot determine from the appellate record whether Mr. Scarborough's convictions are stale, as the Defendant argues. Nothing in the record, including the proof on the motion for a new trial, shows the length of the sentences imposed for these two convictions or whether Mr. Scarborough served time in prison or received some form of an alternative sentence. As such, we simply do not have the information necessary to determine whether Mr. Scarborough's prior convictions are within or outside the ten-year time limit.

However, even assuming that the heightened balancing standard for stale convictions applies, we conclude that the impeaching convictions were admissible. First, the probative value of these convictions as to credibility was high. In analyzing the admissibility of prior convictions for impeachment, a trial court is "required to determine and explain the relevance of the convictions to the issue of credibility." *State v. Williamson*, No. W2019-00437-CCA-R3-CD, 2020 WL 1274770, at *5 (Tenn. Crim. App. Mar. 16, 2020), *perm. app. denied* (Tenn. Nov. 17, 2020). Importantly, while a felony crime "need not involve dishonesty" to be admissible for impeachment, our supreme court has "rejected a per se rule that permits impeachment by any and all felony convictions." *Waller*, 118 S.W.3d at 371. Instead, "[a] prior felony conviction still must be analyzed to determine whether it is sufficiently probative of credibility to outweigh any unfair prejudicial effect it may have on the substantive issues of the case." *Id.* "To determine how probative a

felony conviction is to the issue of credibility, the trial court must assess whether the felony offense involves dishonesty or false statement." *Id.*

In this case, the witness had felony convictions for aggravated burglary and theft of property. This court has recognized that "burglary and theft offenses are highly probative of credibility because these crimes involve dishonesty." *Lankford*, 298 S.W.3d at 181. In fact, a prior conviction for burglary is so probative of credibility that it may be used to impeach an accused on trial for another burglary, at least "absent circumstances that require a different result." *State v. Baker*, 956 S.W.2d 8, 15 (Tenn. Crim. App. 1997) (citing cases); *State v. Middlebrooks*, No. W2014-00469-CCA-R3-CD, 2015 WL 226093, at *4 (Tenn. Crim. App. Jan. 15, 2015), *no perm. app. filed*.

Second, the witness's credibility was critical to the relevance of his testimony. The Defendant called Mr. Scarborough solely to testify on the victim's character for untruthfulness; thus, his credibility was likewise key. This court has recognized that the probative value of an impeaching conviction increases when witness credibility is "the sole or primary issue." *State v. Bowen*, No. W2015-01316-CCA-R3-CD, 2016 WL 6776348, at *5 (Tenn. Crim. App. Nov. 15, 2016), *perm. app. denied* (Tenn. Mar. 9, 2017). As is often the case with child sexual abuse offenses, the credibility of the witnesses was crucial here. There was no physical evidence of sexual abuse, and so the credibility of the child victim and the witnesses was the primary issue for the jury's consideration.

Third, the supreme court has recognized the possibility that a greater number of impeaching convictions "are more probative of credibility than a lesser number would be[.]" *Waller*, 118 S.W.3d at 373; *see also State v. Walker*, 29 S.W.3d 885, 891 (Tenn. Crim. App. 1999). That the witness had convictions for both theft and aggravated burglary increased the probative value of the convictions as to his credibility.

Upon our de novo review, and after considering the entire record, we conclude that the specific facts and circumstances support admission under Rule 609 of Mr. Scarborough's prior aggravated burglary and theft convictions for impeachment purposes because their probative value substantially outweighed any prejudicial effect. As such, even assuming that the heightened balancing standard for stale convictions applies, the Defendant is not entitled to relief.

## D.  SENTENCING

Finally, the Defendant raises two issues concerning his sentencing.  First, he asserts that the trial court should have imposed an alternative sentence to incarceration, including a split-confinement sentence.  He also contends that the trial court should not have imposed consecutive sentences, arguing that the victim's distant family relationship with the Defendant and the nature of the contact should not result in consecutive sentences.

As we noted above, the trial court merged the sexual battery convictions into a single conviction of sexual battery by an authority figure, a Class C felony (Count 4).  It sentenced the Defendant to serve six years for this offense.  The court also sentenced the Defendant to serve two consecutive years for violating the Sexual Offender Registry, a Class E felony, for a total effective sentence of eight years in confinement.

We address each of the Defendant's issues in turn.

### 1.  Standard of Appellate Review

"[W]hen a defendant challenges the length of a sentence that falls within the applicable statutory range and reflects the purposes and principles of sentencing, the appropriate standard of appellate review is abuse of discretion accompanied by a presumption of reasonableness."  *State v. King*, 432 S.W.3d 316, 321 (Tenn. 2014) (citing *State v. Bise*, 380 S.W.3d 682, 706-07 (Tenn. 2012)).  As such, this court is "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out" in the Sentencing Act.  *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008).  These standards also apply to a trial court's decision to grant or deny alternative sentencing, as well as to impose consecutive sentences.  *See State v. Caudle*, 388 S.W.3d 273, 279 (Tenn. 2012); *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013).

In each of these contexts, "this deferential standard of review is subject to an important caveat: the trial court must 'place on the record any reason for a particular sentence.'"  *State v. Sheets*, No. M2022-00538-CCA-R3-CD, 2023 WL 2908652, at *5 (Tenn. Crim. App. Apr. 12, 2023) (quoting *Bise*, 380 S.W.3d at 705), *no perm. app. filed.* After all, "appellate courts cannot properly review a sentence if the trial court fails to articulate in the record its reasons for imposing the sentence."  *Bise*, 380 S.W.3d at 706 n.41.

## 2. Alternative Sentencing

The Defendant first asserts that the trial court abused its discretion when it denied his request for an alternative to incarceration, specifically arguing that a split-confinement sentence "would have been appropriate according to the sentencing considerations." For its part, the State contends that the trial court properly weighed the applicable considerations to the Defendant's case and appropriately found that the Defendant was not a suitable candidate for alternative sentencing. We agree with the State.

Of course, "[a]ny sentence that does not involve complete confinement is an alternative sentence." *State v. Crabtree*, No. M2021-01154-CCA-R3-CD, 2023 WL 2133831, at *19 (Tenn. Crim. App. Feb. 21, 2023) (citation omitted), *no perm. app. filed.* And, "[t]he Sentencing Act encourages trial courts to utilize alternative sentences." *Ray v. Madison Cnty.*, 536 S.W.3d 824, 833 (Tenn. 2017). Nevertheless, pursuant to Tennessee Code Annotated section 40-35-103(1), a court may order sentences involving confinement if they are based on one or more of the following considerations:

 (A) whether "[c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct";

 (B) whether "[c]onfinement is necessary to avoid depreciating the seriousness of the offense[,] or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses"; or

 (C) whether "[m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant."

Our supreme court has also recognized that "[t]he guidelines applicable in determining whether to impose probation are the same factors applicable in determining whether to impose judicial diversion." *State v. Trent*, 533 S.W.3d 282, 291 (Tenn. 2017) (citation and internal quotation marks omitted). To that end, "[w]hen considering probation, the trial court should consider the nature and circumstances of the offense, the defendant's criminal record, the defendant's background and social history, the defendant's present condition, including physical and mental condition, the deterrent effect on the defendant, and the best interests of the defendant and the public." *State v. Feagins*, No. E2022-00311-CCA-R3-CD, 2023 WL 2784813, *3 (Tenn. Crim. App. Apr. 4, 2023) (citation and internal quotation marks omitted), *no perm. app. filed.* The trial court must

also consider the defendant's potential for rehabilitation in determining whether to impose an alternative sentence.  Tenn. Code Ann. § 40-35-103(5).

The record shows that the Defendant was eligible for an alternative sentence because his crimes qualified for probation and the trial court imposed a sentence for each crime of ten years or less.  Tenn. Code Ann. § 40-35-303(a).  Importantly, "[t]he primary goal of probation, under the [Sentencing] Act and the decisions of the appellate courts of this state, is [the] rehabilitation of the defendant." *State v. Burdin*, 924 S.W.2d 82, 86 (Tenn. 1996).  Our legislature has also recognized that "effective rehabilitation" is often achievable only with the "voluntary cooperation of defendants."  Tenn. Code Ann. § 40-35-102(3)(C).

In denying alternative sentencing and imposing full incarceration, the trial court reviewed the considerations from Tennessee Code Annotated section 40-35-103(1).  The court found that the Defendant's criminal history was "very serious," though that factor alone did not justify confinement.  The court also found that incarceration was needed to avoid depreciating the seriousness of the offense due to the prior similar behavior and effect of the crimes on the victim.  The court also considered the Defendant's potential for rehabilitation and found that his moderate risk of reoffending, his poor likelihood of success in treatment, and his failure to be rehabilitated after "very similar behavior" all weighed against an alternative sentence.

Pressing against these findings, the Defendant makes two arguments.  First, he contends that the trial court erred when it found that depreciating the seriousness of the offense weighed against the Defendant and utilized this consideration to deny an alternative sentence.  He argues that the trial court did not find that the circumstances of the offenses as committed were "especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree[,]" but rather, its statement that this factor was "a mixed bag" indicated that such was, in fact, not the case.  The State responds by observing that the trial court considered multiple factors from Tennessee Code Annotated section 40-35-103(1), so this additional finding the Defendant insists upon was not required because the trial court's denial of an alternative sentence was not based solely on the need to depreciate the seriousness of the offense.  We agree with the State.

Generally, to deny alternative sentencing based *solely* on the seriousness of the offense, "the circumstances of the offense as committed must be especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree, and the nature of the offense must outweigh all factors favoring a sentence other than confinement." *State v. Trotter*, 201 S.W.3d 651, 654 (Tenn. 2006).  However, these

additional considerations only apply when the need to avoid depreciating the seriousness of the offense is the *sole* consideration by which a trial court denies an alternative sentence. *State v. Sihapanya*, 516 S.W.3d 473, 476 (Tenn. 2014). When a trial court instead denies probation based upon a combination of factors, as it did in this case, and the record supports those factors, "the heightened standard of review" is not applicable. *Id.*

In this case, the trial court's decision to deny an alternative sentence was based on a combination of considerations. In addition to the need to avoid depreciating the seriousness of the offense, the court also considered the similarity of the Defendant's prior criminal conduct to the instant offenses and his lack of amenability to rehabilitation. *See* Tenn. Code Ann. § 40-35-103(1)(A), (C). Because the trial court based its order of confinement on more than one ground set out in Tennessee Code Annotated section 40-35-103(1), the heightened standard of review required by *Trotter* and *Trent* does not apply.

Next, the Defendant argues that the trial court improperly found that rehabilitative measures were frequently or recently applied to him unsuccessfully. However, in the context of the Defendant's rehabilitative potential, the trial court weighed more heavily that the Defendant continued to repeat the same behavior while released in the community and on the Sexual Offender Registry. The trial court also considered the Defendant's moderate risk of reoffending from the risk and needs assessment, as well as the psychosexual evaluator's opinion that the Defendant would not "get much out of sex offender treatment because he's maintaining his innocence." The trial court properly considered this factor when evaluating the propriety of an alternative sentence.

Ultimately, the standard of appellate review is important to this issue. The trial court identified the correct standards of law that applied to its consideration of alternative sentencing. It considered and weighed the appropriate statutory and common-law factors and made a reasoned choice between acceptable alternatives after considering the relevant facts on the record. In other words, the trial court's decision to impose incarceration was neither illogical nor unreasonable. We conclude that the trial court acted within its discretion to deny an alternative sentence and impose a sentence of full confinement. *See Caudle*, 388 S.W.3d at 279.

### 3. Consecutive Sentencing

The Defendant next challenges the trial court's decision to impose consecutive sentences pursuant to Tennessee Code Annotated section 40-35-115(b)(5). This statute permits consecutive sentences to be considered when

[t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]

The Defendant argues that his conduct did not justify consecutive sentences. While acknowledging that the trial court need not find all aggravated circumstances, he argues that the court did not consider the period of undetected activity as an aggravating factor. He also maintains that the distant familial relationship with the Defendant and the nature of the contact should not result in consecutive sentences. In response, the State asserts that consecutive sentences were warranted given the relationship between the Defendant and the victim, the fact that the conduct involved multiple body parts, and the extent of the residual physical and mental effects on the victim. We agree with the State.

The process of imposing discretionary consecutive sentences pursuant to Tennessee Code Annotated section 40-35-115(b) involves two steps. First, the trial court must find by a preponderance of the evidence that "the defendant qualifies for consecutive sentencing under one of the classifications set forth in section 40-35-115(b)." *State v. Perry*, 656 S.W.3d 116, 127 (Tenn. 2022) (footnote omitted). Second, the trial court must "then choose whether, and to what degree, to impose consecutive sentencing based on the facts and circumstances of the case, bearing in mind the purposes and principles of sentencing." *Id.*

We defer to "the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" *Pollard*, 432 S.W.3d at 861. As our supreme court has recognized, "[s]o long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id.* at 862 (citations omitted).

In this case, the trial court found that the Defendant qualified for consecutive sentencing under Tennessee Code Annotated section 40-35-115(b)(5). This court has previously held that "not all of the aggravating circumstances listed in section 40-35-115(b)(5) must be present to support the imposition of consecutive sentencing." *State v. Doane*, 393 S.W.3d 721, 738 (Tenn. Crim. App. 2011) (citation and internal quotation marks omitted). In fact, "consecutive sentences may still be appropriate under section 40-

26

35-115(b)(5) even when one factor militates against them if the other aggravating circumstances have been established and carry sufficient weight." *Id.*

In this case, the trial court considered the aggravating circumstances required by section 40-35-115(b)(5): (1) the relationship between the Defendant and the victim; (2) the time span of the Defendant's undetected sexual activity; (3) the nature and scope of the sexual acts; and (4) the extent of the residual, physical, and mental damage to the victim. Consistent with the Defendant's argument, the trial court found that the time span of the undetected sexual activity with the victim did not weigh in favor of consecutive sentences. However, the trial court found that the remaining aggravating circumstances had been established in this case.

The record supports the trial court's finding that the Defendant exploited his familial relationship with the victim to gain access to her and to accomplish the acts. As the court observed, the relationship was not tenuous, as the Defendant suggested, but was one where the victim, the Defendant, and their entire family often spent time together before these events. Because of this relationship, the victim's care was entrusted to the Defendant and his wife that evening. As observed by the trial court, the incident lasted long enough for the Defendant to touch multiple body parts of the victim, including her breasts and genitalia over her clothes.

The record also supports the trial court's finding as to the extent of harm caused by the Defendant's abuse. The victim completed an impact statement that included details of her emotional distress, counseling and medication for depression and anxiety, feelings of disgust and shame, family disruption, and being labeled a troublemaker and liar. She indicated she was still suffering psychologically at the sentencing hearing. *E.g.*, *State v. Pruitt*, No. E2021-01118-CCA-R3-CD, 2022 WL 4005810, at \*6 (Tenn. Crim. App. Sept. 2, 2022) (affirming imposition of consecutive sentences, in part, stating that "the record supports the trial court's determination that the victim suffered from residual and mental damage as a result of the abuse sufficient to support this aggravating circumstance and that the trial court did not abuse its discretion in this regard"), *perm. app. denied* (Tenn. Jan. 11, 2023); *State v. Himes*, No. M2020-00407-CCA-R3-CD, 2022 WL 1088242, at \*12 (Tenn. Crim. App. Apr. 12, 2022) (affirming consecutive sentencing where, though the period of the abuse was unclear, the defendant was the victim's mother's live-in boyfriend, he abused a position of private trust by molesting the victim while she was in his care, and the trial court found that the victim suffered residual mental and physical damage from the abuse), *no perm. app. filed*. We conclude that the trial court acted within its discretion in imposing consecutive sentences in this case. The Defendant is not entitled to relief.

**CONCLUSION**

In summary, we hold that the evidence is legally sufficient to support the Defendant's convictions. We also hold that the trial court acted within its discretion in qualifying minor witnesses, admitting evidence of prior criminal convictions, and ordering consecutive and custodial sentences. Accordingly, we respectfully affirm the judgments of the trial court.

s/ **_Tom Greenholtz_**
TOM GREENHOLTZ, JUDGE